UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS D. COLLIER,                 )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )        Case No. 4:05CV00274 AGF
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )
            Defendant.             )


## MEMORANDUM AND ORDER

This matter is before the Court[1] for judicial review of the final decision of the

Commissioner of the Social Security Administration denying Plaintiff Thomas D.

Collier's application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434, and supplemental security income benefits under Title XVI of

the Act, id. §§ 1381-1383f.  For the reasons discussed below, the decision of the

Commissioner shall be affirmed.

Collier was born on September 22, 1966.  He applied for benefits on March 14,

2003, claiming an onset date of April 17, 2000, due to degenerative disc disease (neck

and back pain); back and left shoulder injuries from a 1985 accident (when he was hit by

a truck), which were made worse by a second car accident in 1990; and extreme

confusion due to head trauma and headaches.  Previous applications for disability benefits

filed by Plaintiff in March 2001 and January 2002 were denied.  The application in the

---

[1]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

present case was denied at the initial administrative level. A hearing was held before an administrative law judge (ALJ) on May 25, 2004, at which Plaintiff appeared and testified, represented by counsel. A vocational expert (VE) also testified at the hearing. On August 24, 2004, the ALJ issued a decision that Collier was not disabled within the meaning of the Act. On December 16, 2004, the Appeals Council of the Social Security Administration denied Collier's request for review. Collier thus has exhausted all administrative remedies, and the decision of the ALJ is the final decision of the Commissioner.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that the ALJ erred in assessing his credibility with respect to his complaints of chronic neck and back pain and in posing to the VE a hypothetical question that did not include all the relevant facts with respect to his limitations.

## BACKGROUND

### Work History

Plaintiff worked at various jobs as a laborer, machine operator, roofer, painter, and welder. Tr. at 142. The record includes his earnings record from 1986 through 2000, which was the last year showing any earnings. During those years, Plaintiff's earnings were under $6,000 per year in 1986, 1987, 1991, 1993, 1996, 1997, and 2000. His earnings in the other years were between approximately $8,000 and $21,000 (1995). Tr. at 96.

## Medical Record

In June 1990, Collier was treated in a local hospital emergency room after being a front-seat passenger in a roll-over car accident. He reported hitting his head inside the car. He had a large hematoma and complained of headaches but reported no dizziness or blurred vision. X-rays showed no skull fracture, normal visualized bone density and architecture, and no compression fracture or significant loss of joint space. Tr. at 332-39. In June 1998, Plaintiff suffered a hairline fracture to his right wrist, and in December 1998, he injured his right knee (torn medial and possibly lateral meniscus).

In March 2000, Plaintiff had an x-ray of his cervical spine, a CT scan, an MRI, and a consultative examination. The x-ray revealed degenerative disc disease with posterior spurs; the CT scan showed posterior spurring at multiple levels, encroachment of the spinal canal ventrally at C5-6, and mild narrowing of the left neural foramen at C6-7; and the MRI showed mild disc narrowing and posterior spurs at C5-6, severe narrowing at C6-7 and C7-T1, and posterior spurs at C6-7. Notes from the examination showed normal muscle tone and bulk, no muscle atrophy, normal sensation to temperature and light touch, normal gait, cervical and lumbar pain, and some limitation of range of motion. Tr. at 191, 213.

On August 17, 2000, Plaintiff was examined by D. Garrido, M.D., for complaints of left intrascapular pain radiating to the left shoulder, upper arm, and forearm. Dr. Garrido noted slight tenderness of the left posterior area. He also noted that Plaintiff walked without support and showed no muscle weakness or muscle atrophy or loss of sensation. Dr. Garrido diagnosed cervical myalgia with probable cervical radiculopathy

on the left, and recurrent neck pain on the left of five months duration.  In August and September 2000, Plaintiff had four physical therapy sessions for pain, tingling, and numbness in his left shoulder and arm.  Treatments consisted of moist heat, ultrasound, and exercise.  His pain decreased to 0 out of 10 (from 7 out of 10), his range of motion increased, and he was discharged to a home exercise program.  Tr. at 234-44.

From August 1999 through April 2001, Plaintiff saw Wallace Berkowitz, M.D., for dislocation of his nasal bones, airway blockage, and cervical and shoulder pain.  Plaintiff's diagnosis included cervical arthritis, with spasms, and degenerative disc disease, for which Dr. Berkowitz prescribed Vicodin and Percocet.

On October 31, 2001, Francis Walker, M.D., a neurosurgeon, examined Plaintiff with complaints of neck and left shoulder pain.  Dr. Walker noted that Plaintiff's neck motions were limited and that his left arm and wrist were smaller and weaker than his right arm and wrist with some weakness on the left, but no motor, reflex, or sensory abnormalities.  Dr. Walker believed that Plaintiff would be a candidate for surgery and referred him to a surgeon.  Tr. at 250.

On March 18, 2002, Dr. John Rabun performed a neuropsychiatric evaluation and medical examination.  Plaintiff told him about his constant neck and back pain, headaches, dizzy spells, and confusion.  Plaintiff did not complain of hallucinations or delusions and was oriented, could concentrate, and could remember words, dates, locations, and times.  Dr. Rabun diagnosed a Global Assessment of Functioning (GAF) of

70.[2]  Physical examination revealed normal muscle tone and bulk, with pain noted in the

cervical and lumbar areas and overall reduced range of motion.  Plaintiff was able to

tandem and heel/toe walk and his gait was normal without an assistive device.  Dr. Rabun

diagnosed cervical and lumbar disc disease and headaches.  Tr. at 256-59.  An MRI

conducted on March 25, 2002, showed minimal scoliosis and mild degenerative changes

at L4-5 and disc space narrowing, with the lumbar spine being "otherwise unremarkable."

Tr. at 262.

The record includes a "Report of Contact" completed by the state disability

determinations agency on April 4, 2002.  This report states that Plaintiff was contacted to

inquire about Dr. Walker's referral of Plaintiff to a surgeon and that Plaintiff stated that

he did not see the surgeon because his insurance had expired in January 2002.  The report

further notes that Plaintiff stated that he was no longer taking Vicodin, but was taking

Valium for anxiety due to his financial situation and daily headaches.  Tr. at 158.

On April 12, 2002, Judith McGee, Ph.D., completed a psychiatric review

technique form.  She found no medically determinable mental impairment.  She noted the

adequacy of Plaintiff's insight, judgment, and fund of knowledge; his problems sleeping

and concentrating due to pain; and his change in social life and lack of friends.  She also

---

[2]     A GAF score represents a clinician's judgment of an individual's overall ability
to function in social, school, or occupational settings, not including impairments due to
physical or environmental limitations.  Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 41 to 50 reflect "serious" difficulties
in social, occupational, or school functioning; scores of 51-60 indicate "moderate"
difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

noted that Plaintiff was very withdrawn and constantly irritated due to his pain. She found that he showed no depressive symptoms other than his mood. Tr. at 263-77.

A physical residual functional capacity (RFC) assessment completed on April 27, 2002, by a medical consultant for the state agency for disability determinations, indicated that Plaintiff could lift or carry ten pounds occasionally or frequently; could stand or walk with normal breaks, for at least two hours in an eight-hour workday; could sit with normal breaks, for six hours in an eight-hour workday; but was limited in his ability to push or pull due to his neck and back pain. Due to his degenerative disc disease of the cervical spine, Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl. He was limited in reaching in all directions, including overhead, but unlimited in handling, fingering, and feeling. Plaintiff did not have visual, communicative, or environmental limitations, other than to avoid concentrated exposure to hazards, such as machinery, unprotected heights, and slippery floors, etc., and to avoid even moderate exposure to vibration. Tr. at 278-88.

On May 3, 2002, a neurologist examined Plaintiff for symptoms of radiating low back and neck pain. The doctor's notes report normal motor strength in the upper and lower extremities, full range of motion of the neck, decreased sensation in the hand, a normal gait, and reflexes that were intact except for a mild increase at the knees, and a normal gait. The doctor reported that there was no other evidence to suggest myelopathy. He recommended conservative occupational/physical therapy and prescribed Naproxen. Tr. at 292-95.

Plaintiff received physical therapy from May 15, 2002, to June 12, 2002. On May 15, 2002, he complained of increased neck pain and numbness and tingling in his left shoulder and arm, and that significant symptoms began in 1997 and worsened due to lifting at work. He reported that sitting gave him some relief, that his sleep was interrupted several times a night, and that he was unable to perform any daily activities. Therapy notes dated May 28, 2002, reflect that Plaintiff reported pain at 9 out of 10. The therapist noted that Plaintiff was able to sit quietly in the clinic and showed no signs of restlessness, and that he showed no significant deficits of gait. Tr. at 301-14. Following Plaintiff's evaluation on May 15, 2002, there are notes of two therapy sessions during this time period. The notes reflect Plaintiff canceled one appointment due to a report of severe pain.

In early October 2002, Plaintiff reported an increase in his neck and back pain. Tr. at 350-51. An MRI dated October 30, 2002, of the cervical and lumbar spines showed overall straightening of the lordotic curve, with C5-6, C6-7 and C7-T1 diffuse disc bulges with spinal canal and moderate neural foraminal compromise and effacement of the thecal sac, the vertical body heights and marrow within the vertebral bodies appeared normal, and a L4-5 central disc herniation without significant compromise of the spinal canal or neural foramina; degenerative disc disease and significant disc bulges at C5-6, C6-7, and C7-T1; a diffuse disc bulge at C5-6 causing mild stenosis of the spinal canal; mild to moderate narrowing of the bilateral neural foramina; a moderate diffuse disc bulge at C6-7 and C7-T1; and a disc bulge at L4-5. Tr. at 348-49.

On November 8, 2002, Plaintiff reported pain, loss of strength, and headaches. Tr. at 299-300. When Plaintiff filed the present application for disability benefits on March 14, 2003, a Social Security Administration representative observed that Plaintiff was neatly dressed and had no noticeable difficulties sitting, standing, walking, or using his hands.

On June 13, 2003, Plaintiff presented to the medical clinic he had been going to, and reported continuing neck and low back pain and daily headaches. His prescription for Vicodin was refilled, and Plaintiff's chart was referred to a neurosurgeon. Tr. at 344-45. On November 19, 2003, Plaintiff was diagnosed with cervicalgia, left upper extremity radiculopathy, and lumbar and left sciatica. A cervical epidural steroid injection administered on November 19, 2003, was "tolerated well" and significantly decreased Plaintiff's pain. Tr. at 362-63.

**Evidentiary Hearing**

Plaintiff testified at the May 25, 2004 evidentiary hearing that he was 5 feet 9 inches tall, weighed between 190 and 205 pounds, and was right-handed. He testified that he had no source of income at the time and that he was receiving food stamps. He had a GED but no specialized job training. He did not have a driver's license due to two DWIs and was not eligible to have his license reinstated until 2007. After reviewing his work history, Plaintiff testified that he now had problems with short-term memory. He testified that he had not used alcohol since 1996. Tr. at 382-96.

Plaintiff testified that he suffered from severe headaches "just about everyday" since 1985, when he was hit by a truck. His headaches worsened in 1990 when he was in

a car accident. Plaintiff testified that the headaches lasted about half an hour and that he took Roxocet and Klonopin for them. He testified that the medication made the headaches bearable, but did not make them go away. Plaintiff stated that since 1998, he suffered from tremors or seizures "almost every other night," and took the same medication for this condition as he did for his headaches. He walked slowly and had difficulty climbing stairs. For several years he had had trouble with his equilibrium and he could not run. Tr. at 396-400.

Plaintiff testified that he had constant pain in his neck and that he could only move his neck from side to side with difficulty. When he moved his neck to the left, he experienced a sharp pain from the base of his skull, through his shoulders, down his left arm and into his fingers, causing tingling and numbness. Plaintiff stated that the pain had spread to his right shoulder and right hand, and that he had muscle spasms and difficulty grasping and holding objects with both hands. His problems with his right hand began when he broke his right wrist in 1998. He also stated that the heaviest thing he could pick up was a half-gallon of milk, and that he could only lift his arms over his head about three-fourths of the way up. Tr. at 400-02.

Plaintiff further testified that he also had "shooting pain" from his lower back, down his left leg, to his toes. He testified that his medications (Percocet and Roxocet) helped "very little," making the pain bearable. He could not bend very far due to his lower back pain and would lose his balance due to the pain in his left leg. He had to rest after walking one or two blocks, due to pain, and could stand about ten minutes and sit 30 minutes before having to lie down or change position to alleviate his pain and numbness.

Plaintiff testified that the spinal injection he received in November 2003 did not help and that he was not allowed to return because he did not have insurance. Tr. at 402-06.

Plaintiff testified that he lived with his mother and could take care of his personal needs without assistance. He testified that to tie his shoes, he would sit down, raise his foot up, and cross his foot to tie the shoe. He went to the grocery store with his mother once a month, but his mother did most of the cooking. He did not do any housework or yard work and he no longer engaged in any social activities. When asked if he thought he was depressed, Plaintiff responded, "It does get depressing." Tr. at 406-07.

Plaintiff testified that he read the newspaper, listened to music, and watched television. He napped several times a day, for 30 to 45 minutes at a time, due to lightheadedness caused by high blood pressure. Plaintiff testified that any movement caused pain and that his situation made him depressed. He testified that he was told that the best thing for him would be to have back surgery, but that he could not afford it and for four years had worn a back brace every other day and a neck brace three times a week with some relief of pain. He denied ever telling a physician that he was adamant about not wanting surgery. Tr. at 408-11.

The VE testified that someone of Plaintiff's age, education, and past relevant work, with limitations for lifting and carrying; sedentary exertion for standing, walking and sitting; with only occasional stooping, kneeling, crouching, and crawling, no overhead reaching, pushing or pulling, and no exposure to vibration, unprotected heights or slippery floors, would not be able to perform his past relevant work. The VE also testified that unskilled work would be available for such an individual, such as a

sedentary cashier, a food and beverage order clerk, and a sedentary assembler, in the St. Louis metropolitan area. The VE testified, however, that no competitive employment would be available for an individual with the above limitations who could not maintain attention and concentration for one-hour increments due to pain or the side effects of medication needed to control tremors, or who needed to lie down for several hours during the workday, or who suffered from short-term memory loss, or had communication problems. Tr. at 411-14.

**Third-Party Statements**

The record includes two Daily Activities Questionnaires completed by Plaintiff's mother, one in February 2002, and one in March 2003. In the first form she stated that she tended to most of Plaintiff's cooking and laundry, and sometimes helped him put on and take off his socks and shoes, and on occasion, when Plaintiff's pain was unbearable, helping him in and out of bed. She further stated that for the past two years, Plaintiff had been very withdrawn and had no friends. She stated that Plaintiff could not function normally as he used to and was constantly irritated about not being able to do things for himself. Tr. at 157. In the later questionnaire, Plaintiff's mother stated that Plaintiff was unable to bend over and tie his shoes and that it was hard for him to reach for something above his head without moaning in pain. She stated that about six months prior, he started to wear a neck brace sometimes and was wearing his back brace more often, and that this helped him get around better, but did not take away the pain. She also reported that Plaintiff never left the house, was angry and complained most of the time, and had mood changes. Tr. at 170.

**Decision of the ALJ**

The ALJ found that Plaintiff was not disabled within the meaning of the Act.
The ALJ first found that Plaintiff met the non-disability requirements of the Act, was
insured for disability benefits through the date of decision (August 24, 2004), and had not
engaged in substantial gainful activity since his alleged onset date (April 17, 2000).  The
ALJ then found the alleged headaches, confusion, and brain trauma to be nonsevere
impairments that did not cause more than minimal limitations on Plaintiff's ability to
perform work-related activities, and thus, were not "severe" as defined by the
Commissioner's regulations.  In support of this finding, the ALJ noted that there was no
CT or MRI evidence of brain damage; that Plaintiff was not taking over-the-counter or
prescription medication for headache; that the March 2002 consultative neuropsychiatry
evaluation by Dr. Rabun showed appropriate demeanor, ability to focus and concentrate,
think logically, and had no psychiatric diagnosis.  The ALJ also noted that the state
agency psychologist who had reviewed the evidence concluded that Plaintiff had no
severe mental impairment.  Tr. at 17-18.

The ALJ then reviewed the medical evidence of Plaintiff's physical impairments
and found that the evidence indicated that Plaintiff had degenerative disc disease of the
cervical and lumbar spine with chronic neck, low back, and left shoulder pain,
impairments that were severe, but not severe enough to meet or medically equal, either
singly or in combination, one of the deemed-disabling impairments listed in the
regulations.  Id. at 18-20.

The ALJ next considered whether Plaintiff had the RFC to perform his past relevant work and, if not, to perform other work existing in significant numbers in the national economy. The ALJ stated that he considered the nature, degree, and level of the claimant's subjective complaints of pain, discomfort, and fatigue and the functional limitations that they imposed, under the criteria set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984) (pain), and <u>Jackson v. Bowen</u>, 873 F.2d 1111 (8th Cir. 1989) (fatigue).

The ALJ found that Plaintiff's subjective complaints of pain were not credible with respect to intensity, severity, frequency or duration, as to preclude sedentary work,[3] in light of

> the only <u>mild to moderate</u> MRI findings with <u>no</u> significant objective evidence of lower extremity radiculopathy on examination, some <u>mild</u> ulnar neuropathy of the left upper extremity, the efficacy of his current medications, the lack of any medical treatment since November 2003, the claimant's statements that appear to exaggerate his pain, the fact that

---

[3] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

> "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

> no treating physician has noted any functional limitations and the
> opinion of the State Agency physician.

Tr. at 22. The ALJ stated that there was no evidence of an inability to effectively

ambulate; that Dr. Rabun's March 2002 neurological examination was normal; that in

May 2002, the examining neurosurgeon reported some mild increase of the reflexes of the

knees, but no other evidence to suggest myelopathy; and that Plaintiff did not use an

assistive device to ambulate. The ALJ stated that Plaintiff had not sought "alternative

medicine therapies consistent with his alleged disabling limitations, e.g., chiropractic,

acupuncture, medical massage or consistent pain management." Tr. at 22. The ALJ

believed that Plaintiff's alleged inability to perform any activities of daily living "appears

to be volitional in basis." The ALJ noted that Plaintiff could take care of his personal

hygiene, walk and use public transportation to get around, and prepare simple meals. The

ALJ stated that Plaintiff's alleged functional limitations were inconsistent with his actual

daily activities. ALJ also stated that no surgery or further diagnostic testing had been

recommended. Tr. at 22.

The ALJ assigned "[s]ubstantial evidentiary weight" to the opinion of the state

agency physician, based upon the record, and the testimony of the VE. The ALJ found

that Plaintiff had the RFC to occasionally and frequently lift and carry ten pounds; stand

and walk two hours in an eight-hour work day; sit six hours in an eight-hour work day;

and only occasionally climb, balance, stoop, kneel, crouch, and crawl. Plaintiff could not

push or pull with his upper extremities or reach overhead, and had to avoid concentrated

exposure to vibration, unprotected heights, and slippery floors.

The ALJ noted that as Plaintiff's past work was medium to heavy semi-skilled work, Plaintiff did not have the RFC to perform his past relevant occupations, and that the burden thus shifted to the Commissioner to show that Plaintiff could perform other jobs that existed in significant numbers. The ALJ noted that application of the Medical-Vocational Guidelines directed a finding of "not disabled" for an individual with Plaintiff's RFC and vocational factors (age, education, and past relevant work experience), but that reliance upon the Guidelines was inappropriate here as Plaintiff could not perform the full range of sedentary work due to pain. The ALJ then relied upon the testimony of the VE to conclude that Plaintiff was not under a "disability" as defined by the Act. Id. at 24.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" Id. (citations omitted); Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (noting that the "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard). The court's review is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision[; the court] must 'also take into account whatever in the record fairly detracts from that decision.'" Haley v.

Massanari, 258 F.3d 742, 747 (8ᵗʰ Cir. 2001).  "Reversal is not warranted, however,

'merely because substantial evidence would have supported an opposite decision.'"  Reed

v. Barnhart, 399 F.3d at 920 (citing Shannon v. Chater, 54 F.3d 484, 486 (8ᵗʰ Cir. 1995)).

Statutory Framework

"Title II . . . provides for payment of insurance benefits to persons who suffer

from physical or mental disability.  Title XVI . . . provides for payment of disability

benefits to indigent persons."  Fastner v. Barnhart, 324 F.3d 981, 982 (8th Cir. 2003)

(citations omitted).  In order to qualify for Social Security disability benefits (or

supplemental security income benefits), a claimant must demonstrate an inability to

engage in any substantial gainful activity by reason of a medically determinable

impairment which has lasted or can be expected to last for not less than 12 months.  42

U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner employs a

five-step sequential evaluation process.  E.g., Fastner v. Barnhart, 324 F.3d at 983-84.

First, the Commissioner decides whether the claimant is engaged in substantial gainful

activity.  If so, disability benefits are denied.  If not, the Commissioner decides whether

the claimant has a "severe" impairment or combination of impairments, that is, an

impairment which significantly limits an individual's physical or mental ability to do

basic work activities.  This is step two.

If the claimant's impairment is not severe, disability benefits are denied.  If the

impairment is severe, the Commissioner determines whether the claimant's impairment is

equal to one of the impairments listed in Appendix 1 (20 C.F.R. Pt. 404, Subpt. P).  This

is step three. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks whether the claimant has the residual functional capacity to perform his or her past relevant work. This is step four.

If the claimant is able to perform his or her past relevant work, the claimant is not disabled. If the claimant cannot perform his or her past relevant work, the Commissioner asks whether the claimant has the residual functional capacity to perform work in the national economy in view of his or her age, education and training, and work experience. These are vocational factors. This is step five. If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. § 404.1520(a)-(f).

The claimant bears the initial burden at step four to show that he is unable to perform his past relevant work. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). If met, the burden of proof shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of jobs in the national economy that are consistent with the claimant's impairments and vocational factors. Id. If a claimant's impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Id.

Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines due to nonexertional impairments (such as pain or depression), the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony by a VE. Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

In the present case, the ALJ followed the sequential analysis through step five and found that Plaintiff was not disabled, after considering the opinion of the VE in response to a hypothetical question that included the vocational restrictions and exertional and nonexertional limitations which the ALJ found credible.

## DISCUSSION

### ALJ's Credibility Determination

Plaintiff argues that the ALJ erred in not fully crediting Plaintiff's complaints of disabling pain. He argues that the objective medical record shows neck and back conditions consistent with Plaintiff's complaints of pain and that the medical history shows that he regularly sought medical care for neck and back pain. He argues that he did not seek additional medical treatment after November 2003 because he had no income. He argues that even though he could do some daily activities, the Act does not require that a claimant be completely bedridden or helpless in order to be considered disabled.

As noted above, the ALJ stated that he evaluated Plaintiff's subjective complaints of pain by following the analysis set forth in Polaski. In that case, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of

severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." Polaski, 739 F.2d at 1322. The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. Id. The ALJ is not required to discuss each factor expressly, as long as the analytical framework is recognized and considered. Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [the ALJ's decision] even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Here, the ALJ acknowledged the applicability of the analysis in Polaski and other cases. The ALJ believed that Plaintiff's subjective complaints of disabling pain were exaggerated, and based this belief on the objective medical evidence (clinical findings and tests which showed only mild to moderate physical conditions, and walking without an assistive device), the efficacy of current medications and treatment (medication and physical therapy decreased pain), the lack of any conventional medical treatment or alternative therapy since November 2003, the fact that no examining physician nor the state agency physician had noted any functional limitations, and Plaintiff's daily activities. These reasons are, by and large, supported by the record and are valid bases for discrediting allegations of disabling pain. See, e.g., Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (in discrediting extent of pain alleged by plaintiff, ALJ properly

considered plaintiff's failure to take any narcotic medication for pain but rather only taking non-steroidal anti-inflammatory drugs); cf. Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) (ALJ improperly rejected plaintiff's subjective allegations of disabling pain where plaintiff, who had a solid work record, made repeated and consistent visits to doctors and availed himself of many pain treatment modalities).

The Court finds troubling the ALJ's statement that no surgery was recommended for Plaintiff's condition, as well the ALJ's failure to mention Plaintiff's allegations that he did not see a surgeon, or seek medical treatment after November 2003, because he could not afford these treatments. The Eighth Circuit has held that "[i]f a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subjective complaints of pain." Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). However, in evaluating the credibility of a disability claimant's subjective complaints of disabling symptoms where the individual claims he did not seek medical treatment or prescription medication due to a lack of finances, it is permissible for the ALJ to consider the lack of evidence that the individual sought out medical assistance available to indigents. Id.; Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992). Here, the record is devoid of evidence suggesting that Plaintiff sought any treatment offered to indigents for his pain. Accordingly, the Court does not believe that the ALJ's failure to address this issue warrants reversal.

The Court is also troubled by the ALJ's statement that the daily activities testified to by Plaintiff were inconsistent with his alleged functional limitations. As Plaintiff argues, a claimant need not prove that he is bedridden or completely helpless to

be found disabled.  See Reed, 399 F.3d at 923.  Nevertheless, the primary focus of the

ALJ's analysis of Plaintiff's testimony regarding his daily activities was that the ALJ did

not find the testimony credible to the extent that Plaintiff was precluded from any work.

As noted above, this conclusion is supported by the record.  The Court adds that although

the ALJ did not mention Plaintiff's poor work record prior to the alleged onset of

disability, this too supports a finding of not disabled.  See Ramirez v. Barnhart, 292 F.3d

576, 582 (8th Cir. 2002) (plaintiff's poor work record supported ALJ's decision

discrediting extent of pain alleged by plaintiff); Pearsall v. Massanari, 274 F.3d 1211,

1218 (8th Cir. 2001) (poor work history may indicate a lack of motivation to work, rather

than a lack of ability to work).

  In many disability cases, there is no doubt that the plaintiff experiences pain; "the

real issue is how severe that pain is."  Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir.

1999).  Here, in sum, although there is evidence in this record that could support a

different decision, upon review of the entire record, the Court concludes that the ALJ was

entitled to discredit the extent of  pain alleged by Plaintiff, and to find that his exertional

and nonexertional impairments did not preclude all work.

**Hypothetical Question Posed to the VE**

  Plaintiff next argues the ALJ's hypothetical question to the VE failed to include

his particular physical and mental impairments, and that therefore, the VE could not

accurately or properly assess whether jobs he could perform existed in the national

economy.  Specifically, he argues the hypothetical question did not include the inability

to maintain attention and concentration for one hour (due to pain syndrome), the need to

lie down several times during the day (due to pain or lightheadedness), tremors or the side effects of medication for tremors, short-term memory loss, or communication problems. Plaintiff notes that the VE testified that if an individual also had these limitations, he would not be competitively employable.

For a VE's answer to a hypothetical question to constitute substantial evidence, the question must set forth with reasonable precision the claimant's particular physical and mental impairments and limitations. Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005). However, the hypothetical question need only include those impairments and limitations reasonably found credible by the ALJ; discredited subjective complaints are properly excluded from a hypothetical question as long as the ALJ had reason to discredit them. Id. Here, the ALJ did not find the alleged limitations (inattention and lack of concentration, need to rest, tremors, loss of memory, poor communication) to be credible, and the Court concludes that this decision was supported by the record. The ALJ thus properly excluded them from the hypothetical question posed to the VE. The hypothetical question included the functional abilities (frequently lift and carry 10 pounds; stand and walk two hours in an eight-hour work day; sit six hours in an eight-hour work day; no pushing or pulling with upper extremities; no reaching overhead; and only occasionally climb, balance, stoop, kneel, crouch, and crawl) and vocational restrictions (no exposure to vibrations, unprotected heights, and slippery floors) that were supported by substantial evidence on the record as a whole.

## CONCLUSION

Because the ALJ's credibility determination is supported by good reasons and substantial evidence, deference to the ALJ's credibility determination is warranted. The hypothetical question contained the claimant's particular limitations and restrictions as credited by the ALJ. Substantial evidence on the record as a whole supports the decision of the Commissioner finding that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 19th day of September, 2006.